J-A29009-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.I.R.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.L., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 820 WDA 2024 |

Appeal from the Order Entered June 10, 2024
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s):  59 OC 2024

BEFORE:  OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.:                    **FILED: FEBRUARY 12, 2025**

T.L. ("Father") appeals from the June 10, 2024 order that involuntarily terminated his parental rights to his biological daughter, S.I.R.S. ("Child"), born in January of 2020.[1]  After careful review, we affirm.

The certified record reveals the following relevant facts and procedural history.  For the first nine months of her life, Child resided with Parents in Niagara County, New York.  **See** N.T., 6/6/2024, at 17.  As best we can discern, in approximately September of 2020, Mother relocated with Child to Pennsylvania.  **See id.** at 17-22.  Father had no subsequent contact with Child except for one occasion, during an unidentified "winter," when he drove to

_____

[1] The parental rights of D.S. ("Mother," and collectively with Father, "Parents") were involuntarily terminated by separate order on June 10, 2024.  Mother appealed the termination order, which is addressed in a separate memorandum at 821 WDA 2024.

Clarion County to provide Mother with diapers and money. *See id.* at 13, 17-22; N.T., 3/26/2024, at 27.

The Clarion County Office of Children and Youth Services ("CYS" or "the Agency") first became involved with this family in May of 2021, after Mother was evicted from her apartment where she resided with Child. *See* N.T., 3/26/2024, at 7. From May of 2021, until March of 2022, Mother lived at twelve different locations with Child. *See id.* Following this extended period of housing instability, the court adjudicated Child dependent on March 10, 2022. *See id.* at 6-7. Thereafter, Child remained in Mother's care under court supervision until June 20, 2022, when she was removed due to Mother's lack of consistent housing. *See id.* The court established Child's permanency goal as reunification.[2]

The Agency was unaware that Father was Child's biological father until May 25, 2023, when Mother revealed his identity and location in Niagara County, New York. *See id.* at 6-7, 22-23. Upon contact by the Agency, Father acknowledged his paternity of Child, which was subsequently confirmed by genetic testing on September 8, 2023. *See id.* at 24. In furtherance of reunification, the Agency established two permanency goals for Father: (1) to

---

[2] The orphans' court changed Child's permanency goal from reunification to adoption prior to the confirmation of Father's paternity. Mother appealed from the goal change order, but this Court affirmed the order on February 9, 2024. *See In the Interest of S.S.*, 315 A.3d 71 (Pa. Super. 2024) (non-precedential decision) (unpublished memorandum consolidated with *In the Interest of N.B.*, 315 A.3d 71 (Pa. Super. 2024)).

cooperate with the Agency and (2) to ensure Child's basic needs were met. *See id.* at 26.

Beginning on November 1, 2023, Father was offered weekly two-hour virtual visitation with Child due to the distance between his residence and Clarion County and his lack of a valid driver's license. *See* N.T., 3/26/2024, at 27; N.T., 6/6/2024, at 7, 13-14. Father's attendance at the virtual visitation was largely inconsistent, including an extended gap in visitation from January to May of 2024. *See* N.T., 3/26/2024, at 27-28, 37; N.T., 6/6/2024, at 12.

Throughout the dependency proceedings, even after his paternity was established, Father remained uninvolved and ignored Agency outreach. *See* N.T., 3/26/2024, at 27, 35-37. From the time of the Agency's first contact with Father until his paternity was confirmed, Father failed to provide the Agency with requested demographic information, which was essential to complete background checks and child abuse clearances for the members of his household. *See* N.T., 3/26/2024, at 23-25. Moreover, CYS caseworker, Dylan Donine, informed Father that his brother, who owned the house where he resided, was an indicated perpetrator of abuse, and, therefore, the Agency could not place Child in the home. *See id.* at 25-26, 35; N.T., 6/6/2024, at 7, 38-39. Despite this, Father continued to reside in his brother's home at the time of these termination proceedings. *See* N.T., 3/26/2024, at 25-26, 35.

On March 8, 2024, CYS filed a petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The involuntary termination proceedings took place on March 26, 2024, May 6, 2024, and June 6, 2024.[3] Child, then four years old, had been placed with her current pre-adoptive foster parents for over fifteen months.

Despite proper notice, Father failed to appear on March 26, 2024. *See* N.T., 3/26/2024, at 3-4. He was, however, represented by his court-appointed counsel. *See id.* In addition, Father failed to contact his attorney, CYS, or court administration prior to the hearing. *See id.*; N.T., 6/6/2024, at 22-25. CYS presented the testimony of its caseworker, Ms. Donine.

While Father appeared at the next listing on May 6, 2024, his attorney had been excused due to Father's previous lack of appearance and failure to provide communication. *See* N.T., 5/6/2024, at 4. The hearing was therefore continued to allow Father to present testimony with his counsel in attendance.

---

[3] Our Supreme Court has held that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with" 23 Pa.C.S.A. § 2313(a). *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020). In this case, the orphans' court appointed a guardian *ad litem* ("GAL") and separate legal counsel for Child. *See* Order, 3/12/2024. As such, the court complied with the requirements of 23 Pa.C.S.A. § 2313(a).

**See id.** at 4, 23. Finally, on June 6, 2024, Father again appeared and testified on his own behalf.

By order dated June 6, 2024, and entered on June 10, 2024, the orphans' court involuntarily terminated Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its Rule 1925(a) opinion on July 24, 2024.

Father presents the following issues on appeal for our review:

1. Whether the [orphans' court] erred in terminating [Father]'s parental rights under 23 [Pa.C.S.A.] § 2511(a)(1)?

2. Whether the [orphans' court] erred in terminating [Father]'s parental rights under 23 [Pa.C.S.A.] § 2511(a)(2)?

3. Whether the [orphans' court] erred in terminating [Father]'s parental rights under 23 [Pa.C.S.A.] § 2511(a)(5)?

4. Whether the [orphans' court] erred in terminating [Father]'s parental rights under 23 [Pa.C.S.A.] § 2511(a)(8)?

5. Whether the [orphans' court] erred in terminating [Father]'s parental rights under 23 [Pa.C.S.A.] § 2511(b)?

Father's Brief at 2-3.[4]

Our standard of review in this context is well-established:

_____

[4] We note with displeasure that neither Child's GAL nor her legal counsel participated in the instant appeal. Both advocated for termination of Father's parental rights at the conclusion of the termination hearing. **See** N.T., 6/6/2024, at 47-48.

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-830 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *See id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of the subsections of Section 2511(a) by "clear and

convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b).

This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). For the following reasons, we conclude that the orphans' court correctly held that the Agency met its burden of proof pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b), which provide as follows:[5]

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

---

[5] By analyzing only Section 2511(a)(2), we make no conclusions as to the validity of the orphans' court's findings pursuant to Sections 2511(a)(1), (5), and (8). *See B.L.W.*, 843 A.2d at 384. Based on this disposition, we need not review Father's arguments as to Sections 2511(a)(1), (5), and (8).

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*., *citing* *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). In reviewing the orphans' court's findings pursuant to Section 2511(a)(2), we remain mindful that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443.

If the orphans' court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court then turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A.

§ 2511(b); *see also T.S.M.*, 71 A.3d at 267. A Section 2511(b) inquiry must include consideration for the bond between the parent and the child. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has reiterated, "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Interest of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023). The *K.T.* Court described the "severance of a necessary and beneficial relationship [as] the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id.* at 1109-1110, *citing In re E.M.*, 620 A.2d 481, 484 (Pa. 1993) (subsequent citations omitted).

Bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *Id.* We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *See id.*

Father argues that the orphans' court abused its discretion by involuntarily terminating his parental rights pursuant to Section 2511(a)(2) inasmuch as he "was only given the opportunity to be a father" for four months, specifically from when his visitation began on November 1, 2023 to the filing of the Agency's March 8, 2024 termination petition. Father's Brief at 9. Father contends that he fully cooperated with CYS and that the record

was devoid of evidence that he neglected or refused to parent Child at any point in Child's life. *See id.* at 9-10. We disagree.

With respect to Section 2511(a)(2), the orphans' court found that CYS proved by clear and convincing evidence that Father's conduct warranted termination. *See* Orphans' Court Opinion, 7/24/2024, at 16. Specifically, the court found that following the first nine months of Child's life, Father was then absent for three years, despite knowing that he was her biological father. *See id.* at ¶¶ 3, 8, 12.

The orphans' court findings are supported by the record evidence. Ms. Donine testified that she contacted Father in May of 2023 once Mother identified him. *See* N.T., 3/26/2024, at 23. During that contact, Father confirmed he knew he was the biological father of Child prior to contact from the Agency. *See id.* at 24. Additionally, Father verified that he had no involvement with Child, although he was aware of his paternity, for over two and a half years at that time. *See id.* Once Father became aware that Child was in the Agency's custody, his inaction to reunify with and otherwise parent Child continued. Ms. Donine testified that Father refused to provide any requested information to CYS until after his paternity was confirmed. *See id.* at 25. Father consistently remained unengaged with the Agency through the time of the termination proceedings, as Ms. Donine stated "[h]e just ignored me when I tried to involve him." *Id.* at 27.

Father further disregarded the Agency's advisement that Child could not reunify with him at his current residence because his brother was an indicated perpetrator of abuse. *See id.* at 25-26, 35. Specifically, CYS received records from New York stating that Father's brother had "substantiated allegations of excessive corporal punishment and lacerations, bruises, and welts" from a child abuse report in May of 2015. *Id.* at 26. Ms. Donine made Father aware of this impediment to Child being placed in his care, yet he continued to reside in his brother's home. *See id.* at 25-26, 35. Father had no concrete plan to leave the residence at the time of the termination hearing because he refused to acknowledge his brother's status as an indicated perpetrator of abuse. *See id.*; N.T., 6/6/2024, at 8, 10 ("I do not believe it at all. And I believe it's wrong simply because of the fact that he has [joint] custody of the children, his own kids, you know.").

Significantly, Father's arguments are disingenuous as they are all belied by his own testimony. Father testified on direct examination:

Q: . . . Can you state any parental duties that you've performed.

A: No one [has] ever asked me to do anything. No one [has] ever asked me to do anything. I have been in the dark this whole time about all of this, everything that's going on. No one tells me anything.

N.T., 6/6/2024, at 16. Father continued on cross-examination:

Q: But you knew prior to May of 2023 that you were [Child]'s father, correct?

A: Yes. I knew the whole time she was my [daughter].

Q: And you knew you were not on her birth certificate as the father.

A: Yes. So, I had no legal right to do anything.

Q: Okay. But you didn't pursue any type of action to change anything with your status with regard to paternity, correct?

A: I couldn't.

Q: And you knew that, at least at some point after [Mother] left with [Child], that she was in Clarion County, living above a bar, you knew where she was, correct, at that time, you knew where [Child] was?

A: That's the first time [Mother] contacted me out of the blue within a year …

Q: Okay. But at that time, you knew where [Child] was.

A: Right. Right. I knew where she was.

Q: And you knew [Child]—you were upset because [Child] wasn't in a good living condition.

A: Correct.

Q: But you didn't do anything to pursue custody?

A: What was I supposed to do?

*Id.* at 20.

Undoubtedly, Father has had the entirety of Child's life to provide her with the essential parental care, control, or subsistence necessary for her physical or mental well-being, yet he chose to be completely absent from her life from approximately September of 2020, until his mandated visitation began on November 1, 2023. *See id.* at 17-22; N.T., 3/26/2024, at 27. Father admitted by his own testimony that he refused to parent Child and

consequently neglected her due to his pure inaction to be involved in her life in any way for over three years. ***See id.***

Additionally, Father's contention on appeal that he "fully cooperated" with the Agency is insincere and inaccurate. Father testified that he was unaware he had a CYS caseworker, and that he "didn't even know" Ms. Donine was his caseworker. N.T., 6/6/2024, at 13. Further, he testified on direct examination:

> Q: . . . [CYS] alleged that the Agency has been unable to confirm any compliance with the reunification goals as Father has not reported to the Agency's multiple attempts to contact him.
>
> A: Well, I didn't understand—no one had ever told me that it was my responsibility to stay in contact with [the Agency.] . . . I don't even know why I would call them.

***Id.*** at 15. Father later confirmed that he received the permanency plan from CYS, which included his two permanency goals, and that he disagreed with them. ***See id.*** at 37. However, Father never contacted the Agency to discuss the permanency plan. ***See id.*** Indeed, he testified on cross-examination, as follows:

> Q: Okay. Then why didn't you contact CYS or anyone to discuss the goals and what you disagreed with?
>
> A: Why would I do that?
>
> Q: Because [CYS] had custody of your child.
>
> A: Right.
>
> Q: And they were asking you to do certain things in order for your child to come back to you …

A:  They weren't asking me to do anything.  There was nothing in there that was asking me to do anything.

Q:  What did you think those service plan goals were?

A:  There wasn't nothing in there for me.

*Id.* at 37-38.  Father's clear lack of effort to understand or attempt what the Agency required of him demonstrates that he lacked the capacity to parent Child.

The orphans' court's findings that Father's incapacity, neglect, and refusal to parent Child has caused her to be without his parental care, control, or subsistence are supported by the record due to his voluntary absence for most of her life.  *See A.H.*, 247 A.3d at 443.  Further, the record supports that Father's incapacity, neglect, and refusal cannot or will not be remedied. *See id.*  Therefore, we discern no abuse of discretion by the court in terminating Father's parental rights pursuant to Section 2511(a)(2).

With respect to Father's challenge to Section 2511(b), Father essentially mirrors his arguments regarding to Section 2511(a)(2). Specifically, Father contends that because of the limited time between the start of his visitation with Child and the filing of the termination petition, he was not given enough time to form a bond or otherwise build a relationship with Child.  *See* Father's Brief at 13.  Father criticizes CYS for not offering in-person visitation and argues that he attempted to entertain Child during the virtual visits.  *See id.*  Father's arguments merit no relief.

The orphans' court concluded that Child would suffer no harm by termination of Father's parental rights. ***See*** Orphans' Court Opinion, 7/24/2024, at 13. The court found that Father shared no bond with Child due to his aforementioned absence from three of her four years of life. ***See id.*** at ¶ 12. Conversely, the court found that Child, was "attached" and "bonded" to her pre-adoptive foster parents, with whom she had resided since January of 2023. ***See id.*** at ¶ 29, 31-32.

The orphans' court's findings are supported by the record evidence. Ms. Donine testified to the lack of bond as follows:

> Q: Well, what do you see in the bond with the natural parents []?
>
> A: . . . [W]ith [Father], there is no connection or knowing, understanding on [Child]'s end because it appears that, what is reported to me is that she can't even, she can't engage [with Father during virtual] visitation. She doesn't really know who he is. She'd never seen him in person. She can't do the visits for more than a few minutes because she just can't seem to engage with him because she doesn't know who he is.

N.T., 3/26/2024, at 34-35. Further, visitation would be cancelled due to Father's tardiness logging in or his failure to contact the provider. ***See id.*** at 27-28; N.T., 6/6/2024, at 27. Child, then four years old, would often ask for the visits to end after twenty or thirty minutes due to her lack of engagement with Father. ***See id.*** Father admitted during his testimony that Child did not know him, and she often wanted to end the visits early. ***See*** N.T., 6/6/2024, at 11-13, 15, and 22. Father repeatedly described the visits as "terrible" and

"horrible" because of his difficulties operating the virtual platform and keeping Child engaged. *See id.* at 11-13, 15, and 26-32.

Father concedes that he has no bond with Child due to his absence from her life but blames CYS. *See* Father's Brief at 13. However, as previously discussed, Father had Child's entire life to build a bond and relationship with her, yet he did not make any effort to do so. *See* N.T., 6/6/2024, at 17-22. Further, Father admitted that even if CYS would have offered him in-person visitation with Child, it would have been a hardship for him due to the distance and his lack of a valid driver's license. *See id.* at 13-14.

In addition, the court properly considered Child's bond with her pre-adoptive foster parents. It credited the testimony of Ms. Donine, who testified as follows:

> [THE COURT]: So, you were explaining why you're seeking termination?
>
> A: Yes. [Child is] attached to [her] foster parents, and [she is] part of their family, and [she] deserves permanency with a family who is able to meet all [her] basic and special needs.

N.T., 3/26/2024, at 33. At the time of the proceedings, Child had been residing in her pre-adoptive foster home with her half-sister for over fifteen months. *See id.* at 29, 36. Ms. Donine further confirmed that Child is "extremely attached and bonded" to her foster parents and refers to them as "mom and dad." *Id.* at 34. Therefore, we discern no abuse of discretion or error of law in the orphans' court's conclusion that CYS met its evidentiary burden pursuant to Section 2511(b).

Based on the foregoing, we affirm the order pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 2/12/2025